KEITH CARTER, Individually and on )
Behalf of All Others Similarly Situated, )
)
        Plaintiffs, )
)
    v. )        No. 4:13CV1600 HEA
)
FURNITURE BRANDS )
INTERNATIONAL, INC., RALPH P. )
SCOZZAFAVA and VANCE C. )
JOHNSTON, )
)
        Defendants. )

## OPINION, MEMORANDUM AND ORDER

This matter is before the Court on Defendants' Motion to Dismiss Plaintiffs'

Consolidated Amended Complaint. [Doc. No. 45]. Plaintiffs have filed a response in opposition

to the motion. [Doc. No. 50]. Defendants have filed a Reply. [Doc. No. 55]. For the reasons set

forth below, the Motion to Dismiss will be granted.

### Factual Background[1]

Plaintiffs, who purchased shares of the common stock of Furniture Brands, Inc. during

the alleged class period,[2] filed this Consolidated Amended Complaint ("Complaint")[3] against

Ralph Scozzafava ("Scozzafava"), the former Chief Executive Officer and Chairman of the

Board of Directors of Furniture Brands, and Vance Johnston ("Johnston"), the former Chief

---

[1] The factual circumstances are taken from the pleadings and other attachments to the pleadings. The facts and inferences from these documents are taken solely for the purpose of the resolution of the motion and for no other purposes in this piece of litigation. This recitation in no way relieves any party of the necessary proof of any fact in later proceedings.

[2] Between February 13, 2013 and August 5, 2013.

[3] By Order entered on March 4, 2014, the Court consolidated this action with Case Number 4:13CV1703 HEA, and appointed lead plaintiff and lead counsel. [Doc. No. 36]. The Consolidated Amended Complaint was filed on May 5, 2014. [Doc. No. 40].

Financial Officer of Furniture Brands, (collectively "Defendants"),[4] for violations of sections 10(b) and 20(a) of the Exchange Act, and U.S. Securities and Exchange Commission ("SEC") Rule 10b-5.

**A.      Furniture Brands' Poor Sales Performance**

Furniture Brands was in the business of designing, manufacturing, and marketing home furnishings, such as furniture and home accessories. The company reported declining year-over-year net sales in 22 of the 24 quarters between the fourth quarter of 2006 and the third quarter of 2012. As a result of the company's poor performance, Furniture Brands' executive officers neither received salary raises, nor short-term incentive bonuses, from 2008 onward.

Sometime in 2012, the Furniture Brands Human Resources Committee ("HR Committee") lowered the threshold metrics necessary for executive officers to receive bonuses. Previously, the bonuses had been structured as "all or nothing" payouts, through which an executive would not receive any bonus unless certain target metrics were reached. The new plan allowed for executives to receive reduced bonuses if lower thresholds were met. Plaintiffs assert that Defendant Scozzafava, in his role as Chairman of the Board of Directors, heavily influenced the decision to decrease the standards for executive bonuses.

**B.      Fourth Quarter of 2012**

On February 13, 2013, Furniture Brands issued a press release announcing the company's financial results for the fourth quarter and full year of 2012. Despite one analyst's prediction that Furniture Brands' year-over-year net sales would decline by 2% in the fourth quarter of 2012, sales for that quarter increased by 3.3%. The company's sales for the year were $1.072 billion, which beat the incentive threshold of $1.066 billion by $6 million, or one-half of

---

[4] Although Furniture Brands is listed as a defendant in the caption of the Complaint, Plaintiffs make clear that Furniture Brands is a "non-party" and "is not named as a defendant in this action," because, subsequent to the initiation of this action, Furniture Brands filed a voluntary petition for reorganization under Chapter 11 of the United States Bankruptcy Code. [Doc. No. 40 at ¶ 22].

one percent of Furniture Brands' sales for the year. As a result of meeting the sales threshold, and keeping the net adjusted losses for the year ($30.4 million) under the $35 million threshold, Defendants Scozzafava and Johnston received bonuses of $308,775 and $60,344, respectively. One analyst asserted that that management likely employed a "heroic effort" to reach the sales threshold by a "paltry" $6 million.

Additionally, in the fourth quarter of 2012, Furniture Brands reported a trade-name impairment charge of $1.4 million, which was a significant improvement from the $9 million trade-name impairment charge it reported in the fourth quarter of 2011.[5]

## C.     First and Second Quarters of 2013 and Bankruptcy

Following the fourth quarter of 2012, Furniture Brands reported declining year-over-year net sales in the first and second quarters of 2013—down 11.3% and 4%, respectively. Further, in the second quarter of 2013, the company reported a $10.8 million trade-name impairment charge, up from the $1.4 million trade-name impairment charge reported in the fourth quarter of 2012.[6] Plaintiffs assert that it was "extremely rare for the Company to take a trade-name impairment charge outside of the fourth quarter," and note that "this was only the second time during defendant Scozzafava's five years as CEO that the Company had taken a

---

[5] Furniture Brands explained in its 2012 Form 10-K:

> Our trade names are tested for impairment annually or whenever events or changes in business circumstances indicate the carrying value of the assets may not be recoverable. Trade names are tested by comparing the carrying value and fair value of each trade name to determine the amount, if any, of impairment. The fair value of our trade names is estimated using a "relief from royalty payments" methodology, which is highly contingent upon assumed sales trends and projections, royalty rates, and a discount rate. Lower sales trends, decreases in projected net sales, decreases in royalty rates, or increases in the discount rate would cause impairment charges and a corresponding reduction in our earnings and net worth, as it has in past periods.

[Doc. No. 47-4 at 12].

[6] Furniture Brands reported total impairment charges in the second quarter of 2013 of $26.9 million, up from $7.5 million in the fourth quarter of 2012. The company explained that $15.7 million of the $26.9 million impairment charges "were recorded to reflect the abandonment of certain capitalized costs related to a company-wide software implementation. . . . [T]he Company made the decision to abandon its plan to implement certain software programs across the entire organization." [Doc. No. 40 at ¶¶ 112, 116]. Plaintiffs do not assert any impropriety with respect to these other impairment charges.

trade-name impairment charge outside of the fourth quarter; the only other time had been in the third quarter of 2011, after which no additional trade-name impairment charge had followed in the subsequent fourth quarter." [Doc. No. 40 at ¶ 62]. On September 9, 2013, Furniture Brands filed a voluntary petition for reorganization under Chapter 11 of the United States Bankruptcy Code.

## Allegations

Plaintiffs allege that Furniture Brands' reported year-over-year net sales and trade-name impairment charge for the fourth quarter of 2012 were misrepresentations of facts, knowingly made by Defendants, which induced Plaintiffs to buy stock in Furniture Brands at inflated prices, before the truth emerged in the first and second quarters of 2013, causing the stock price to fall. Plaintiffs further allege that Defendants Scozzafava and Johnston manipulated this financial data so that they could receive bonuses before Furniture Brands filed its bankruptcy petition. According to Plaintiffs, Defendants manipulated the data by (1) prematurely recognizing revenue on purported sales before the Company's products had actually been shipped; and (2) selling furniture at steep discounts, as opposed to regularly priced sales.

## Pleading Standard

Section 10(b) of the Exchange Act and SEC Rule 10b-5 "prohibit[] fraudulent conduct in connection with the sale or purchase of securities." *Kushner v. Beverly Enters.*, 317 F.3d 820, 826 (8th Cir. 2003). To state a claim, a plaintiff must allege that a defendant made a misleading statement or omission of material fact, with scienter, on which plaintiff relied, and which caused plaintiff's losses. *See In re K-Tel Int'l, Inc. Sec. Litig.*, 300 F.3d 881, 888 (8th Cir. 2002). The pleading requirements necessary to state a claim for private securities fraud are set forth under the Private Securities Litigation Reform Act of 1995 (the "Reform Act"), 15 U.S.C. § 78u-4(b)(1) and (2). The appropriate pleaded elements are: (1) a material misrepresentation of fact;

(2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *See Minneapolis Firefighters' Relief Ass'n v. MEMC Elec. Materials, Inc.*, 641 F. 3d. 1023, 1028 (8th Cir. 2011). Here, Defendants argue that Plaintiffs have failed to adequately plead the falsity of Defendants' statements, Defendants' scienter, and loss causation.

Although the Court must view the factual allegations in the light most favorable to plaintiffs, *Ritchie v. St. Louis Jewish Light*, 630 F.3d 713, 715–16 (8th Cir. 2011), the Reform Act requires courts to "disregard catch-all or blanket assertions that do not live up to the particularity requirements of the statute," *In re Amdocs Ltd. Sec. Litig.*, 390 F.3d 542, 547 (8th Cir. 2004) (citing *Florida State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 660 (8th Cir. 2001)). In passing the Reform Act, "Congress enacted two heightened pleading requirements for securities fraud cases." *In re Navarre Corp. Secs. Litig.*, 299 F.3d 735, 741–42 (8th Cir. 2002). Congress imposed these more stringent pleading requirements as to the falsity of the defendants' statements, and the defendants' scienter. *In re St. Jude Med. Inc. Secs. Litig.*, 836 F. Supp. 2d 878, 895 (D. Minn. 2011) (citing *Gebhardt v. Conagra Foods, Inc.*, 335 F.3d 824, 830 n.3 (8th Cir. 2003)). "These pleading standards are unique to securities and were adopted in an attempt to curb abuses of securities fraud litigation." *Navarre Corp.*, 299 F.3d at 741.

The Eighth Circuit explains:

First, [with regard to falsity,] the Reform Act requires the complaint to specify each misleading statement or omission and specify why the statement or omission was misleading. 15 U.S.C. § 78u-4(b)(1) (Supp. IV 1998). If the allegation "is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." *Id.* Similarly, Rule 9(b) of the Federal Rules of Civil Procedure had long required that "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. The text of the Reform Act was designed "to embody in the Act itself at least the standards of Rule 9(b)." *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 193 (1st Cir. 1999).

> Second, [with regard to scienter], Congress stated in the Reform Act that a plaintiff's complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2); *Green Tree*, 270 F.3d at 654. The Reform Act requires the court to dismiss the complaint if these requirements are not met. 15 U.S.C. § 78u-4(b)(3). "[U]nder the Reform Act, a securities fraud case cannot survive unless its allegations collectively add up to a strong inference of the required state of mind." *Green Tree*, 270 F.3d at 660.

*Kushner*, 317 F.3d at 826.

The heightened pleading requirements for falsity and scienter under the Reform Act are "more rigorous than those under Rule 9(b) of the Federal Rules of Civil Procedure." *Lustgraaf v. Behrens*, 619 F.3d 867, 874 n.2 (8th Cir. 2010); *cf. Navarre Corp.*, 299 F.3d at 742 ("[T]he investors technically do not need to meet the requirements of both Federal Rule of Civil Procedure 9(b) and the [Reform Act], as the [Reform Act] supersedes reliance on 9(b) in securities fraud cases and embodies the standards of 9(b).").

### Discussion

The Court finds that Plaintiffs have failed to meet the Reform Act's heightened pleading standard with regard to their falsity and scienter allegations. Plaintiffs' falsity allegations amount to fraud by hindsight. Further, Defendants disclosed the information which Plaintiffs claim they omitted; the confidential witness upon whom Plaintiffs rely is unreliable; and Plaintiffs' channel stuffing allegations are factually unsupported. Finally, Plaintiffs' scienter allegations fail to meet the motive and opportunity standard.

### A.     Falsity

Plaintiffs contend that the financial results for the fourth quarter and year of 2012, which Furniture Brands reported in its February 13, 2013 press release, were misrepresentations of material facts, born out of Defendants' two-pronged scheme to prematurely recognize revenue and to sell furniture for "pennies on the dollar." Specifically, Plaintiffs allege that, through

prematurely recognizing revenue and selling furniture at deep discounts, Defendants manipulated sales data to reflect a 3.3% increase in year-over-year net sales for the fourth quarter of 2012, which in turn "artificially stemmed the downward trend in the Company's sales." [Doc. No. 50 at 14]. Thus, Defendants were able to "project higher sales, resulting in an understated impairment charge in 4Q12 [of $1.4 million] and lower losses for that period." [*Id.*]. Finally, "Furniture Brands' disclosure of the $10.8 million trade-name impairment charge just two quarters later demonstrates the magnitude by which the $1.4 million charge taken in 4Q12 was understated." [*Id.*].

"It is not enough, under the [Reform Act's] falsity requirement, to allege that fraud has occurred." *Lustgraaf*, 619 F.3d at 874 (citing *In re Cerner Corp. Sec. Litig.*, 425 F.3d 1079, 1083 (8th Cir. 2005)). The Reform Act's heightened pleading standards require Plaintiffs to "plead the 'who, what, when, where, and how' of the misleading statements or omissions." *Cornelia I. Crowell GST Trust v. Possis Med., Inc.*, 519 F.3d 778, 782 (8th Cir. 2008) (quoting *K-Tel*, 300 F.3d at 890). Further, the complaint "must indicate why the alleged misstatements were false when made." *Lustgraaf*, 619 F.3d at 874. The Eighth Circuit has "found allegations insufficient where they point to a statement that a defendant made 'and then show [] in hindsight that the statement is false.'" *Id.* (quoting *Elam v. Neidorff*, 544 F.3d 921, 927 (8th Cir. 2008) (quoting *Navarre Corp.*, 299 F.3d at 743)). Indeed, "[t]he purpose of [the Reform Act's] heightened pleading requirement was generally to eliminate abusive securities litigation and particularly to put an end to the practice of pleading fraud by hindsight." *Navarre Corp.*, 299 F.3d at 742 (citations and internal quotations marks omitted).

1.  <u>Premature Revenue Recognition</u>

Plaintiffs allege that both Generally Accepted Accounting Principles, and Furniture Brands' stated revenue recognition policy, prohibit recognizing revenue from the sale of goods

until the goods have been delivered to the purchaser. [Doc. No. 40 at ¶¶ 126–27; Doc. No. 47-4 at 26]. Plaintiffs further allege that Defendants orchestrated a system of prematurely recognizing revenue in the fourth quarter of 2012 by loading inventory onto tractor-trailers, which were not attached to trucks, so that Furniture Brands could count the inventory as shipped and thus prematurely recognize the revenue from the orders.

Plaintiffs' source for this allegation is one of Furniture Brands' former Retail Logistics Managers (the "RLM"), whose identity has not been disclosed. Plaintiffs' allegations regarding premature revenue recognition are as follows:

> According to the Former Retail Logistics Manager, at the end of the fiscal fourth quarter in 2012, Furniture Brands employees "would load the trailers and we would sit them in the parking lot and then, after a while, if they didn't move, we would bring the merchandise back in. . . . [I]t was all set to go to customers. It had shipping labels on it, that's the only way it would have gotten loaded on the truck—if we had orders and there was [a] manifest."

> According to the Former Retail Logistics Manager, at the end of the quarter, Furniture Brands personnel would load up trailers (that were not yet attached to trucks), and the trailers would sit in the parking lot so Furniture Brands **"could count the revenue as being shipped."**

> As the Former Retail Logistics Manager explained, "the main thing at the end of the quarter and end of the month was to get out every piece of furniture we could **so that revenue could be put on the bill**. . . . If we had orders that were going into the next month, but could actually be shipped, that last Friday or whatever of the physical month, then those trailers would be loaded, put out in the parking lot and then they would be shipped the next week but we could count the revenue for that month or that quarter." According to the Former Retail Logistics Manager, the customers were not actually expecting delivery until the following week (if at all), but Furniture Brands personnel nonetheless put the goods on the trailers and removed the trailers from the warehouse (by parking them in the lot) so that the Company could then immediately recognize the revenue for that quarter. After the end of the quarter, the Company would then actually ship the goods to the customer or, according to the Former Retail Logistics Manager, in certain circumstances, the orders would be cancelled and the furniture returned to inventory. In those cases, product loaded on trailers and recorded as revenue were never even delivered to customers.

> The Former Retail Logistics Manager stated that each 53-foot trailer contained approximately $50,000 worth of goods. The $50,000 figure was the wholesale price; at retail, according to the Former Retail Logistics Manager, the price would

be double that. The Former Retail Logistics Manager stated that there were four or five trailers at quarter-end with $50,000 worth of wholesale goods located at each of three Furniture Brands warehouses in North Carolina—totaling approximately $600,000 to $750,000—that would be shipped a week after the end of the quarter. However, the revenue for these goods was recognized ***during*** that quarter, despite that the goods were not actually shipped until ***after*** the quarter (if at all). The warehouses where this happened were the Causby Road Warehouse, the Central Warehouse in Thomasville, and the Lenoir Warehouse, all located in North Carolina.

The Former Retail Logistics Manager said that the customers who would receive these shipments were Furniture Brands' franchise dealers.

With respect to the inventory that sat in the trailers, the Former Retail Logistics Manager explained that Furniture Brands personnel knew when to put it on the trailers because the operating system "would do that. It would put the orders that were in the system that were complete or if they were set to complete, those types of things." "The system would show that the order was ready to be shipped, that every component was in the warehouse and it was ready to go. So it would be an order complete and basically, when you are talking in the logistical system, you get it on the trailer at the end of that month, and then it would make it to the dealership pretty much on time."

The Former Retail Logistics Manager explained how Furniture Brands' personnel knew to load the trailers with goods before the end of the quarter—so that the Company could recognize revenue on those goods during that quarter—even though the goods were not being shipped to the customer until the beginning of the next quarter. According to the Former Retail Logistics Manager, "the system would show us all available orders that were ready to ship, if they were ready to ship, no matter what the ship dates were. Normally, the guys in the warehouse and those types of folks would not see the requested ship dates. They would see that that order is, there's three sofas for that order, all three sofas are in the warehouse, it's ready to go and, if there's no customer holds, like you know the customer was on credit hold or anything like that, then it would be available to ship and, you know, the warehouse folks, they had folks working overtime trying to find orders that were ready to go."

The Former Retail Logistics Manager said: "We would put out all stock at the end of the quarter. You know we had a term for it, we called it 'bang week.' . . . Like bang bang shoot 'em up." "We would work you know like an extra Saturday or we would work you know Friday night until everything closes something like that. We would work a couple of hours at the end of each day. . . . [W]e just knew that everything had to get out and if it sits you know 15 extra hours at the end of the month, it took 15 extra hours. And what would happen would be the next week, start of the next physical month, we would have like a couple of days there where we would work only partial shifts, or we wouldn't work at all" because there would be nothing to do since he and his colleagues had taken care of it before the quarter ended the previous week. "We would suck the system dry."

That notwithstanding, the Former Retail Logistics Manager correctly understood that Furniture Brands' policy was to record revenue on shipment.

Prematurely recognizing revenue in this manner had the effect of inflating Furniture Brands' net sales in the quarter prior to the quarter in which the sales should have been recorded. As a result, Defendants were able to achieve the targeted net sales necessary to trigger their bonus payments.

[Doc. No. 40 at ¶¶ 68–77] [alterations and emphasis in original].

In response to these allegations, Defendants argue that "the timing of when a handful of trailers were allegedly *loaded*—the only thing the CW actually purports to know—does not indicate when the Company *recognized revenue* for any of the products on those trailers (i.e., the Company could have legitimately reversed its revenue on goods that were not actually shipped and the end of the quarter)." [Doc. No. 50 at 4] [emphasis in original].

The Court agrees with Defendants. Nothing in Plaintiffs' description of the RLM's duties and responsibilities is even tangentially related to accounting, or suggests that the RLM would have any insight whatsoever into Furniture Brands' accounting practices:

The Former Retail Logistics Manager was employed at Furniture Brands for 18 years. From 2005 to 2013, the Former Retail Logistics Manager was responsible for all areas of logistics including home delivery, Retail Service Centers and Customer Service. The Former Retail Logistics Manager oversaw home deliveries from the retail stores; worked with personnel in Furniture Brands' service centers; worked with Furniture Brands designers on logistic problems and home delivery; and located third parties to perform the deliveries. The Former Retail Logistics Manager was a go-between with the different warehouses in North Carolina, protection planning, retail, and home delivery. Most recently, the Former Retail Logistics Manager worked at the warehouse on Causby Road in Morganton, North Carolina. The Former Retail Logistics Manager sometimes reported to senior executives based in Furniture Brands' corporate headquarters in St. Louis. Specifically, the Former Retail Logistics Manager reported to Edward D. Teplitz ("Teplitz"), who was President of the Thomasville division, and Kevin Kramer, who was Senior Vice President of the Thomasville division.

[Doc. No. 40 at ¶ 67].

The Eighth Circuit has clearly noted that confidential witness allegations will be disregarded as unreliable under the heightened pleading standards of the Reform Act where a plaintiff "fail[s] to provide any information regarding how employees at this level of the company would have access to the [ ] information" alleged (*Cornelia*, 519 F.3d at 783); relies on witnesses whose information comes only second or third-hand (*Horizon Asset Mgmt. v. H&R Block, Inc.*, 580 F.3d 755, 763 (8th Cir. 2009)); or fails to establish that the witnesses "would have a basis to know what [defendants] knew." *Id.*

The RLM states repeatedly, and in conclusory fashion, that trailers were loaded at the end of the fourth quarter of 2012 for the express purpose of prematurely recognizing revenue. Plaintiffs utterly fail to explain how the RLM, whose duties revolve around logistics and delivery, would have access to information regarding when and how the company recognized revenue for the fourth quarter of 2012, or any quarter. For purposes of evaluating the instant Motion, the Court accepts as true Plaintiffs' allegations that the trailers were loaded—at a frantic pace—at the end of the fourth quarter of 2012. *Green Tree*, 270 F.3d at 666. However, without factual allegations building a foundation for how the RLM had knowledge as to when, how, and if revenue was recognized for the inventory loaded on the trailers, Plaintiffs' allegations to that effect fail to meet the Reform Act's heightened pleading standard. Indeed, there could be any number of benign explanations for loading the trailers at the end of the quarter, that may not have trickled into the unsubstantiated "water cooler chatter" that takes place between employees of any company. *See, e.g.*, *City of Pontiac Gen. Emps. Ret. Sys. v Schweitzer-Mauduit Int'l, Inc.*, 806 F Supp. 2d 1267, 1296–97 (N.D. Ga. 2011) ("[R]eliance on confidential witnesses [in a securities case] is permissible only so long as the complaint unambiguously provides in a cognizable and detailed way the basis of the whistleblower's knowledge. In other words, the Court must be able to determine whether the [confidential

witness] has reliable first-hand knowledge or whether his statements are based on unreliable hearsay or gossip.") (citations and internal quotation marks omitted); *Limantour v. Cray Inc.*, 432 F. Supp. 2d 1129, 1141 (W.D. Wash. 2006) ("The Court must be able to tell whether a confidential witness [in a securities case] is speaking from personal knowledge, or merely regurgitating gossip and innuendo.") (citation and internal quotation marks omitted).

For these reasons, Plaintiffs have failed to adequately plead falsity through the premature recognition of revenue in the fourth quarter of 2012.

2.    Selling Furniture for Pennies on the Dollar

Plaintiffs further allege that the company was able to reach the sales threshold necessary for Defendants Scozzafava and Johnston to receive their respective bonuses because, "towards the end of 2012," the company "was selling furniture for pennies on the dollar to discount stores Big Lots, Tuesday Morning, and TJ Maxx." [Doc. No. 40 at ¶ 78] [internal quotation marks omitted]. Again relying on the RLM as a confidential witness, Plaintiffs assert that approximately 5-10 "trailer loads" of discounted furniture were sent from each of at least four different Furniture Brands warehouses to discounting stores in the fourth quarter of 2012.

Plaintiffs allege:

According to the Former Retail Logistics Manager, there were "trailer loads" of discounted furniture on at least four different Furniture Brands warehouses in North Carolina: Thomasville Central Warehouse (in Thomasville); Thomasville warehouse (in Lenoir); Drexel Heritage and Henredon warehouses (in Morganton); and the Broyhill warehouse (in Lenoir). The Former Retail Logistics Manager stated that there were approximately 5-10 trailers in the fourth quarter in each of the four warehouses. Based on his review of the appointment schedules for the trailers, as well as conversations he had with workers loading the trailers destined for discounting stores, the Former Retail Logistics Manager confirmed that these trailers were, in fact, destined for discounting stores.

As the Former Retail Logistics Manager explained, "what they would do is offer the product at well below cost profits to get the dealers to take it . . . ." Furniture Brands "would take excess inventory and cut the wholesale price down so far that the dealers would be jumping at it because they wouldn't mess with the MSRP . .

. [the dealers] would get a dresser or an entertainment center for – normally costs $800 wholesale, they would get it for like $300."

Discussing how he knew the price of this furniture, the Former Retail Logistics Manager explained that it was "communicated through the channels from the higher ups . . . that it was clearance goods, we had to get rid of the inventory . . ." According to the Former Retail Logistics Manager, **"*Ralph mentioned it at one of his meetings with all of us that, you know, they had to take such a beating on that.*"** The Former Retail Logistics Manager was referring to defendant Ralph Scozzafava. During a factory visit on or about October 2012, Scozzafava spoke to the Former Retail Logistics Manager and his colleagues about how the Company was reducing inventory by selling to discounters as a way of increasing its cash flow.

According to the Former Retail Logistics Manager, Furniture Brands did not normally sell its furniture to discounters. The Former Retail Logistics Manager stated that, based on his extensive experience, discounters would be unable to sell Furniture Brands' merchandise for anything less than $0.10-$0.25 on the dollar.

Defendant Scozzafava periodically met with the Former Retail Logistics Manager and other employees in North Carolina. The Former Retail Logistics Manager explained that "[e]very once in a while [Scozzafava] would come in and tell us how great things were and how we were well positioned to be the leaders and that the Company's finances weren't as bad as what people were saying, that kind of thing."

According to the Former Retail Logistics Manager, decisions concerning pricing of furniture "comes from St. Louis, from the corporate office."

[Doc. No. 40 at ¶¶ 79–84] [alterations and emphasis in original].

Plaintiffs employ their allegations regarding Defendants' use of "heavily discounted sales," to two ends. First, they argue that Defendants misled investors through the omission of material facts. Second, they argue that Defendants engaged in impermissible "channel stuffing."

### i.  *Omission of Material Facts*

The Court finds no omission of material fact relating to furniture discounting. Furniture Brands' February 13, 2012 press release, which announced the sales and trade-name impairment charges for the fourth quarter and year of 2012, stated:

Gross profit was $54.6 million and included $1.0 million in charges related to cost reduction activities, resulting in a gross margin of 20.7%. Gross profit for the fourth quarter of 2011 was $58.8 million and gross margin was 23.0%. Excluding

these charges, the decrease in fourth quarter 2012 gross margin when compared to the year ago period *was primarily due to increased discounts, including the additional clearance of older inventory and product that is being replaced.*

[Doc. No. 47-2 at 3] [emphasis added].

The same day, Furniture Brands held a conference call with analysts and investors, during which Defendant Johnston explained that the decrease in the company's gross margin in the fourth quarter of 2012 as opposed to the fourth quarter of 2011 "*was primarily due to increased discounts, including the additional clearance of older inventory and product that is being replaced.*" [Doc. No. 47-3 at 3] [emphasis added]. Defendant Scozzafava echoed the same point: "Gross margin was down from the prior year quarter even after consideration of the charges [Defendant Johnston] described, *primarily driven by increased discounts including those for older inventory and product that we are working on replacing.*" [*Id.* at 4] [emphasis added].

Similarly, the company's 2012 Form 10-K discussed the decrease in net sales, gross profit, and gross margin for 2012 as compared to 2011 and explained the significant role of higher discounts and clearance of inventory in these respective declines:

Net sales for 2012 were $1,072.3 million compared to $1,107.7 million in 2011, a decrease of $35.3 million or 3.2%. *The decrease in net sales was primarily the result of continued weak retail conditions resulting in decreased sales and higher discounts, including the additional clearance of older inventory and product that is being replaced.* Supply chain disruptions early in 2012 also contributed to lower sales when compared to the prior year.

Gross profit for 2012 was $244.3 million compared to $267.3 million in 2011. *The decrease in gross profit was primarily due to a decrease in net sales driven by higher discounts, including the additional clearance of older inventory and product that is being replaced*, in addition to supply chain disruptions early in 2012 ($27.1 million), charges from inventory write-downs related to product rationalization ($1.9 million) and increased freight expense ($4.1 million), partially offset by lower employee compensation and benefits and other effects from prior cost reduction activities ($9.6 million), and lower severance expense ($2.0 million). Gross margin for 2012 as a percentage of sales decreased to 22.8% compared to 24.1% in 2011, *primarily due to discounts, including the additional clearance of older inventory and product that is being replaced and increased*

*product writedowns*, partially offset by lower employee compensation and benefits and other effects from prior cost reduction activities, and lower severance expense.

[Doc. No. 47-4 at 20] [emphasis added]. Thus, Defendants explicitly made known to investors, repeatedly, that they had utilized discounts, including the clearance of older inventory and product writedowns.

Plaintiffs argue that these were "insufficient disclosure[s] under securities law" and that "Defendants' failure to disclose the unprecedented extent of their discounting scheme deprived investors of the ability to recognize the damaging impact Defendants knew it would have on: (1) future sales, which were cannibalized by the steeply discounted goods; and (2) the Company's trade-name, which resulted in the oversized impairment charges at the end of the Class Period." [Doc. No. 50 at 6–7]. By "unprecedented extent of [Defendants'] discounting scheme," Plaintiffs refer to their repeated invocations of the RLM's statement that the company was "selling furniture for pennies on the dollar" to discount stores. Plaintiffs further argue that "[h]aving chosen to discuss Furniture Brands' use of discounts, Defendants were 'obligated to make a full disclosure of any material facts.'" [*Id.* at 16] [quoting *Pub. Pension Fund Grp. v. KV Pharm.*, 679 F.3d 972, 983 n.8 (8th Cir. 2012)].

However, while the RLM's "pennies on the dollar" statement is vague and nonspecific, as are most of Plaintiffs' allegations regarding the alleged discounting scheme,[7] Plaintiffs do cite the RLM for one particularized and specific factual statement on this subject:

---

[7] As Defendants correctly note:

[The RLM] never identifies a particular transaction with a particular discount store, much less whether the amount of products offered to any particular store was unusual in 4Q12 as compared to other reporting periods, or even what amount of product was subject to discounts in 4Q12.

This lack of particularity is unsurprising given the [confidential witness'] alleged former position in the Company as Retail Logistics Manager who simply "oversaw home deliveries from the retail stores." While he may have been able to determine that certain trailers were "destined for discounting stores" based on "his review of the appointment schedules," the [RLM] is not alleged to have been in any position to know the extent of these discounted sales, much less how they were reported on the Company's books or whether they were not properly disclosed in [Furniture Brands'] financial statements.

As the Former Retail Logistics Manager explained, "what they would do is offer the product at well below cost profits to get the dealers to take it . . . ." Furniture Brands "would take excess inventory and cut the wholesale price down so far that the dealers would be jumping at it because they wouldn't mess with the MSRP . . . *. [the dealers] would get a dresser or an entertainment center for—normally costs $800 wholesale, they would get it for like $300*."

[Doc. No. 40 at ¶ 80] [emphasis added]. Selling a product that costs $800 for $300 is the equivalent of selling it for $0.37 on the dollar. This does not strike the Court as selling the product for "pennies on the dollar," or even at an "unprecedented" discount. Defendants' labeling of such a discount in their public statements as a systematic "clearance" of older, backlogged inventory that was being replaced does not appear to the Court to constitute an omission of material facts.[8] Further, Plaintiffs allege no facts in the way of comparative information from Furniture Brands' historical clearance discount pricing, or industry norms.

Plaintiffs rely on inapposite cases for support in asserting "[c]ourts have sustained claims based on similar allegations that deep discounts were used to mislead investors." [Doc. No. 50 at 16] [citing *Institutional Investors Grp. v. Avaya, Inc.*, 564 F.3d 242, 264 (3d Cir. 2009), and *Lefkoe v. Jos. A. Bank Clothiers*, 2007 U.S. Dist. LEXIS 98777, at *21 (D. Md. Sept. 10, 2007)].

Plaintiffs quote *Avaya* for its holding that the plaintiffs in that case "pled unusual price discounting with the particularity required by the PSLRA." 564 F.3d at 264. However, in *Avaya* the allegations of price discounting came from several confidential witnesses with more relevant roles in the company,[9] as well as a report by Lehman Brothers which explained that its

---

[Doc. No. 55 at 10–11] [citations omitted].

[8] The Court notes that Plaintiffs also quote the RLM as stating that "discounters would be unable to sell Furniture Brands' merchandise for anything less than $0.10-$0.25 on the dollar." [Doc. No. 40 at ¶ 82]. The import and relevance of this assertion is unclear to the Court.

[9] The confidential witnesses included a former Global Contracts Manager who participated in negotiating contracts with many of Avaya's biggest clients; a former employee who was responsible for evaluating the profitability of special bids that constituted half of Avaya's revenue; a former Senior Client Executive; a former Director of

knowledge of the level of the defendants' discounts came from interviewing the company's resellers. *Id.* at 248–50. Further, the defendants in *Avaya* made repeated public statements, in response to direct questions during an earnings conference call, which denied employing unusual pricing discounts and instead reassured investors that the pricing of goods remained "fairly steady." *Id.* The same defendants later admitted to offering 30–40% discounts during the same period. *Id.* Finally, the *Avaya* court accepted the plaintiffs' falsity allegations based on the defendants' denials—in response to direct questions—of their use of discounting, but rejected the plaintiffs' falsity allegations based on the defendants issuing financial projections which they allegedly knew to be false because of their use of discounts. *Id.* at 267.

Here, in contrast to *Avaya*, where the defendants denied using discounts, Defendants disclosed that they had employed discounting and clearance of their inventory. Further, Plaintiffs' falsity allegations here are predicated upon reported financials—particularly the trade name impairment charge—which Plaintiffs claim misled investors about future performance. In *Avaya*, the court outright rejected the plaintiffs' falsity claim based on financial projections.

Similarly, in *Lefkoe*, the plaintiffs alleged that "on approximately 12 separate occasions, Defendants affirmatively misrepresented inventory issues and omitted from public statements their knowledge of the Company's excessive levels of inventory over the class period, its need to steeply discount inventory, and the resulting harm to sales of core merchandise and the Spring 2006 line." The plaintiffs in *Leftkoe* alleged that, although "[t]he[] discounts resulted in increased sales of the surplus merchandise, . . . the aggressive pricing strategy . . . eroded the Company's overall profit margin." Again, in contrast, Defendants here not only disclosed the utilization of discounting the company's backlogged inventory, they identified these practices as the primary cause of Furniture Brands' decrease in net sales, gross profit, and gross margin for

Operations for Global Solutions Sales and Support; and an independent Avaya Sales Manager who sold Avaya's products but was not employed by the company.

2012 as compared to 2011. [Doc. No. 47-4 and 20]. Thus, neither *Avaya*, nor *Lefkoe*, supports

Plaintiffs' position.

For the reasons stated, the Court finds that Plaintiffs have failed to meet the Reform

Act's pleading standard in alleging that Defendants misled investors through the omission of

material facts.

          *ii.*    *Channel Stuffing*

Plaintiffs' channel stuffing allegations fail as well. The Seventh Circuit has explained:

> The term ["channel stuffing"] refers to shipping to one's distributors more of
> one's product than one thinks one can sell. A certain amount of channel stuffing
> could be innocent and might not even mislead—a seller might have a realistic
> hope that stuffing the channel of distribution would incite his distributors to more
> vigorous efforts to sell the stuff lest it pile up in inventory. *Channel stuffing*
> *becomes a form of fraud only when it is used, as the complaint alleges, to book*
> *revenues on the basis of goods shipped but not really sold because the buyer can*
> *return them.* They are in effect sales on consignment, and such sales "cannot be
> booked as revenue. Neither condition of revenue recognition has been fulfilled—
> ownership and its attendant risks have not been transferred, and since the goods
> might not even be sold, there can be no certainty of getting paid. But those
> strictures haven't stopped some managers from using consigned goods to fatten
> the top line—that is, the revenue line—of the corporate income statement."

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 709 (7th Cir. 2008) (emphasis added)

(quoting H. David Sherman et al., Profits You Can Trust, Spotting & Surviving Accounting

Landmines 30 (Financial Times Prentice Hall 2003), and citing *SEC v. McAfee, Inc.*, Civ.

Action No. 06-009 (PJH), 2006 SEC LEXIS 2 (N.D. Cal. Jan. 4, 2006)); *see also Phillips v.*

*Scientific-Atlanta, Inc.*, 489 F. App'x 339, 340 n.1 (11th Cir. 2012) ("While 'channel stuffing'

is not per se illegal or fraudulent, it 'may amount to fraudulent conduct when it is done to

mislead investors.' One particular way 'channel stuffing' can mislead investors is by creating

the impression that sales for a product are strong, and will continue to be strong, when—in

fact—'stuffed' product is stacking up at customers; and the product backlog will likely cause a

slowing of future orders.") (citation omitted); *Ok. Firefighters Pension & Ret. Sys. v. Smith &*

*Wesson Holding Corp.*, 669 F.3d 68, 76 (1st Cir. 2012) (affirming grant of summary judgment for defendant on channel stuffing allegations, noting that "offering discounts to stimulate sales is not automatically manipulation and may well stimulate demand," and finding that "the plaintiffs' case . . . rests on only three pull-in deals plus rhetoric; nothing shows that the pull-ins were unusual, represented a significant percentage of the reported sales for the quarter, or were otherwise suspect. . . In sum, such practices are neither inherently fraudulent nor always innocent; size, design, purpose, transparency, and history are all relevant.").

Not only do Plaintiffs make clear that the discounting stores were not Furniture Brands' normal distributors,[10] Plaintiffs fail to allege that any of the discounted merchandise was ever returned.[11] Thus, Plaintiffs fail to allege that any of the discounted sales were consignment sales, impermissibly recognized as revenue. *Cf. Dutton v. D&K Healthcare Res.*, 2006 U.S. Dist. LEXIS 42553, at *88–89 (E.D. Mo. June 23, 2006) (denying defendants' motion to dismiss in a securities case where plaintiff "set out with particularity the material misstatements in the public statements *which omitted, among other things, the alleged channel-stuffing transactions and the alleged nature of the 'sales' as actually being consigned inventory. . . .* [Plaintiff] further allege[d] that defendants delayed recognition of the true nature of these channel-stuffing transactions, and delayed accounting for the true nature of these transactions as consigned inventory while publicly touting strong future profits and continued excellent business prospects with current customers.") (emphasis added).

---

[10] "According to the Former Retail Logistics Manager, Furniture Brands did not normally sell its furniture to discounters." [Doc. No. 40 at ¶ 82].

[11] With regard to the furniture which Plaintiffs allege was loaded onto trailers at the end of the fourth quarter of 2012 for the purpose of prematurely recognizing revenue, Plaintiffs allege that "in certain circumstances, the orders would be cancelled and the furniture returned to inventory. In those cases, product loaded on trailers and recorded as revenue were never even delivered to customers." [Doc. No. 40 at ¶ 70]. However, Plaintiffs specify that "the customers who would receive these shipments were Furniture Brands' franchise dealers." [Id. at ¶ 72]. In other words, Plaintiffs delineate clearly between the furniture that was allegedly loaded onto trailers to recognize revenue prematurely, which was meant for the company's franchise dealers, and the 5-10 trailers per warehouse of furniture sent to the discount stores.

Further, as discussed above, Defendants were transparent with investors regarding their use of discounting for the purpose of clearing out backlogged inventory that was being replaced and did not make public statements about future sales. *See Ok. Firefighters*, 669 F.3d at 76 (noting that the "size, design, purpose, transparency, and history" of offering discounts are important in channel stuffing allegations). This stands in stark contrast to cases in which the corporate defendants allegedly engaged in channel stuffing activities, failed to apprise investors of their use of discounts or the fact that the "sales" were contingent, and made public statements about sustaining sales numbers without disclosing that the sales were impermissibly recognized on the strength of unsustainable discounts or consignment sales. *See, e.g., St. Jude*, 836 F. Supp. 2d at 891 ("Plaintiffs allege that STJ mislead investors by stating that its earnings and growth rate would be maintained even though STJ was engaging in an unsustainable pattern of channel stuffing and not properly accounting for its sales."); *Dutton*, 2006 U.S. Dist. LEXIS 42553, at *88–89 (E.D. Mo. June 23, 2006) ("[Plaintiff] further alleges that defendants delayed recognition of the true nature of these channel-stuffing transactions, and delayed accounting for the true nature of these transactions as consigned inventory while publicly touting strong future profits and continued excellent business prospects with current customers.").

Plaintiffs cite a letter a financial analyst familiar with Furniture Brands filed with the Bankruptcy Court in which he stated that, based on his analysis, "management almost certainly 'stuffed the channel' with respect to sales in its fourth quarter [of 2012] to meet the sales threshold needed to pay itself the short-term incentive." [Doc. No. 40 at ¶ 59]. However, Plaintiffs cite no basis the analyst gave for forming such a belief, thus rendering his statement conclusory and inadequate under the Reform Act. *See In re Synovis Life Techs., Inc. Sec. Litig.*, 2005 U.S. Dist. LEXIS 18187 (D. Minn. Aug. 25, 2005) ("The bald assertion of one broadcasting analyst is insufficient to plead with particularity that Defendants failed to adjust

Synovis' guidance when it possessed information indicating it was appropriate to do so."); *cf.*

*Avaya*, 564 F.3d at 263 (considering analyst's assertion that the defendant company offered

"aggressive" and "unusually attractive" discounts, where the complaint disclosed that the report

was based on information obtained from the company's resellers).

Instead, Plaintiffs repeatedly cite the analyst's statement that management likely

employed a "heroic effort" to reach the sales threshold:

> Moreover, in response to an analyst's question, CEO Scozzafava replied that December sales were up 13%, January sales were down, February "relatively flat" and down in March. By implication, this suggests that October/November sales were down by about 10% and that January sales were down at a level equal to or greater than the 11% reported decrease of the first quarter overall. ***As we read it, management likely used some heroic effort to "make" the sales threshold target by the paltry $6 million it reported***. We leave it to the Court to decide whether to investigate this issue further and to reach its own conclusion about management behavior.

[Doc. No. 40 at ¶ 59] [emphasis in original]. These allegations, devoid of any particularity, do

not meet the heightened pleading standard required under the Reform Act.

In *Cerner Corp.*, the Eighth Circuit affirmed the dismissal of a channel stuffing

allegation:

> Although Crabtree is not required to describe in detail the circumstances of Cerner's pulling in activities, *he is required to plead with particularity the 'who, what, when, where, and how' of the pulling in*. Here, Crabtree's complaint alleges that the pulling in took place and caused an overstatement in Cerner's earnings during each quarter in the class period and an impairment in Cerner's ability to meet future earnings guidance. *The complaint fails, however, to allege the amount of any overstatements, the extent of any pulling in that took place, or the amount of any revenue that was pulled in from future quarters*. Thus, the complaint's general description of the pulling in, without more, cannot satisfy the heightened falsity pleading standard.

425 F.3d at 1084 (emphasis added) (citing *Navarre*, 299 F.3d at 744–75 (general description of

alleged wrongdoing by defendants, unaccompanied by more specific information, does not

reach the level of particularity required by the Reform Act).

Here too, Plaintiffs fail to provide anything beyond a general description of an alleged channel stuffing scheme to pull in revenue from future quarters. Plaintiffs' channel stuffing allegations thus fail to meet the Reform Act's heightened pleading standard.

3.    Falsity Conclusion

In sum, Plaintiffs' falsity allegations—when the unreliable statements of the RLM are disregarded—constitute pleading fraud by hindsight. The Court "cannot countenance pleading fraud by hindsight[.]" *K-Tel*, 300 F.3d at 891 (quoting *Green Tree*, 200 F.3d at 662). Plaintiffs' stripped-down argument is that the $10.8 million trade name impairment charge which Furniture Brands took in the second quarter of 2013 demonstrates the falsity of the sales the company reported for the fourth quarter of 2012, and the corresponding $1.4 million trade name impairment charge it took that quarter. These allegations cannot survive a motion to dismiss under the Reform Act. *See Id.* ("Mere allegations that statements in one report should have been made in earlier reports do not make out a claim of securities fraud. Corporate officials need not be clairvoyant; they are only responsible for revealing those material facts reasonably available to them.") (citations and internal quotation marks omitted). Accordingly, Plaintiffs have failed to adequately plead falsity.

**B.    Scienter**

Under the Reform Act, Plaintiffs are required to plead scienter by "stat[ing] with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Cerner Corp.*, 425 F.3d at 1083 (alteration in original) (quoting 15 U.S.C. § 78u-4(b)(2)). Plaintiffs fail to plead a "strong inference" of scienter under the Reform Act's heightened pleading standard.

The Eighth Circuit has noted that "[s]cienter can be established in three ways: (1) from facts demonstrating a mental state embracing an intent to deceive, manipulate, or defraud, (2)

from conduct which rises to the level of severe recklessness; or (3) from allegations of motive and opportunity." *Cornelia*, 519 F.3d at 782 (citation omitted). Here, Plaintiffs attempt to establish scienter by alleging that "Defendants possessed the requisite motive and opportunity to artificially inflate Furniture Brands' net sales and net earnings." [Doc. No. 40 at ¶ 178]. Plaintiffs argue that "Defendants were motivated to manipulate the two specific financial metrics that they needed to qualify for long-awaited bonuses, which they expected to be their last bonuses before the Company went bankrupt." [Doc. No. 50 at 20].

To determine whether Plaintiffs have adequately pled scienter, the Court must consider "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322–23 (2007). The Supreme Court has explained:

> [I]n determining whether the pleaded facts give rise to a "strong" inference of scienter, the court must take into account plausible opposing inferences. . . . The strength of an inference cannot be decided in a vacuum. The inquiry is inherently comparative: How likely is it that one conclusion, as compared to others, follows from the underlying facts? To determine whether the plaintiff has alleged facts that give rise to the requisite "strong inference" of scienter, a court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff. The inference that the defendant acted with scienter need not be irrefutable, i.e., of the "smoking-gun" genre, or even the "most plausible of competing inferences." Recall in this regard that § 21D(b)'s pleading requirements are but one constraint among many the [Reform Act] installed to screen out frivolous suits, while allowing meritorious actions to move forward. Yet the inference of scienter must be more than merely "reasonable" or "permissible"—it must be cogent and compelling, thus strong in light of other explanations. A complaint will survive, we hold, only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.

*Id.* at 323–24 (citations and footnote omitted).

With regard to Plaintiffs' allegation that Defendants Scozzafava and Johnston were motivated to manipulate financial data in order to receive bonuses of $308,775 and $60,344,

respectively, the Court notes that "general allegations of a desire to increase stock prices, increase officer compensation or maintain continued employment are too generalized and are insufficient" to plead scienter under the Reform Act. *K-Tel*, 300 F.3d at 895 (citation omitted). The exception being "where an individual defendant will benefit to an unusual degree, based upon the magnitude of a compensation package tied to earnings and the timing of an overstatement of earnings." *Id.* at 894 (citing *Green Tree*, 270 F.3d at 661).

In *Green Tree*, one of the defendant executives had a "remarkable contract awarding him 2.5% of Green Tree's pre-tax income," which resulted in him allegedly being "the highest paid business executive in the United States," receiving $65 million and $102 million in 1995 and 1996, respectively, with a base salary of $430,000. 270 F.3d at 650, 661. The *Green Tree* plaintiffs alleged that the executive's "remarkable contract" would expire at the end of 1996 and, thus, he knew that "1996 would be the last year for which he would receive bonus compensation valued in the tens of millions of dollars . . . [the executive]'s 1997 compensation was valued at approximately $4.8 million, about $97 million less than the value of his original 1996 compensation."[12] *Id.* at 661. The *Green Tree* court "conclude[d] that the magnitude of [the executive]'s compensation package, together with the timing coincidence of an overstatement of earnings at just the right time to benefit [the executive], provide[d] an unusual, heightened showing of motive to commit fraud." *Id.*

Here, Defendants argue:

> [T]he actual bonus amounts Scozzafava and Johnston received in 2012— $308,775 and $60,344, respectively—are insufficient to create an inference of scienter absent other suspicious circumstances, and Plaintiff does not offer any "suspicious" circumstances. *See Horizon Asset Mgmt. v. H&R Block, Inc.*, 580 F.3d 755, 766 (8th Cir. 2009) (defendant's bonuses over two years totaling approximately $258,000 held insufficient to create inference of sceienter); *Kushner*, 317 F.3d at 830 ($630,000 bonus and options were not sufficient to give

---

[12] After Green Tree restated its 1996 earnings, the executive had to repay a portion of his 1996 bonus. *Green Tree*, 270 F.3d at 661.

rise to any inference of scienter); *In re Synovis Life Technologies*, 2005 WL 2063870, at *16 (stock gain bonus of $1.6 million insufficient to provide evidence of scienter); *In re Cerner Corp*, 425 F.3d at 1085 (finding that neither largest incentive bonus paid to any one individual defendant totaling approximately $355,000, nor $1 million aggregate bonuses, created an inference of an improper motive).

[Doc. No. 46 at 20]. Plaintiffs counter that, notwithstanding the relatively small size of Defendants' bonuses in this case,[13] Plaintiffs have pled "suspicious circumstances." [Doc. No. 50 at 21]. Specifically, Plaintiffs argue that the "heroic efforts" they allege that Defendants undertook to meet their sales target, the fact that "the Company [was] teetering on the brink of bankruptcy," and "Defendants underst[anding] [of] 2012 as their last opportunity to earn a bonus before the Company went bankrupt," constitute "unusual circumstances" sufficient to plead scienter. [*Id.*]. Plaintiffs further contend that "the cases cited by Defendants concerning the bonus amounts they received are distinguishable because they did not involve companies on the brink of bankruptcy." [*Id.* at 21 n.19].

Given the facts of this case, and Plaintiffs' failure to plead falsity, the Court finds that Plaintiffs have not alleged the requisite "unusual circumstances" to demonstrate Defendants' motive and opportunity as means of establishing a "strong inference" of scienter. Nor do Plaintiffs allege other facts indicating a strong inference of Scienter. *Cf. Navarre Corp.*, 299 F.3d at 741 ("Evidence we have found relevant to the scienter issue includes: insider trading in conjunction with false or misleading statements; a divergence between internal reports and public statements; disclosure of inconsistent information shortly after the making of a fraudulent statement or omission; bribery by top company officials; evidence of an ancillary lawsuit, charging fraud, which was quickly settled; disregard of current factual information acquired

---

[13] As compared with the executive bonuses in the relevant case law cited above.

prior to the statement at issue; accounting shenanigans; and evidence of actions taken solely out of self-interest.") (Quoting *Geffon v. Micrion Corp.*, 249 F.3d 29, 36 (1st Cir. 2001)).[14]

The Court finds that the "inference of scienter" Plaintiffs allege is not as compelling as the opposing inference: that despite non fraudulent efforts, Defendants were unsuccessful in preventing a company that had been performing poorly for six years from having to declare bankruptcy.

## C.  Section 20(a) Claim

In order to state a claim under Section 20(a) of the Act, a plaintiff must adequately plead a primary violation of securities laws. *See K-tel*, 300 F.3d at 904 n.20. Because Plaintiffs' Section 20(a) claim is derivative of their claims under Section 10(b), Plaintiffs cannot pursue a Section 20(a) claim. Accordingly, the dismissal of Plaintiffs' 10(b) claims are fatal to their Section 20 claim. *In re Hutchinson Tech., Inc. Secs. Litig.*, 536 F.3d 952, 961 (8th Cir. 2008).

### Conclusion

Based upon the foregoing analysis, Plaintiffs have failed to sufficiently plead a cause of action under the Exchange Act, in light of the heightened pleading requirements of the Reform Act. Their claims are therefore dismissed.

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' Motion to Dismiss Plaintiffs'

---

[14] Plaintiffs spend nearly ten pages of the Complaint alleging that Defendant Scozzafava was an overpaid executive who put himself before the company during his tenure, and continued such practices during the bankruptcy proceedings. These allegations are far too tangential and generalized to be relevant to the scienter determination in the present case.

Consolidated Amended Complaint [Doc. No. 45] is **GRANTED**.

**IT IS FURTHER ORDERED** that this matter is **DISMISSED**.

Dated this 27th day of January, 2015.


_____
HENRY EDWARD AUTREY
UNITED STATES DISTRICT JUDGE